Our next case is John Doe v. Indiana University. Mr. Filer. Let me ask you a preliminary question, Mr. Filer, which is why the plaintiff has been permitted to proceed under a pseudonym. It's true the university found that he had engaged in misconduct, but just think about our last case where the plaintiff's name is Shane Kitterman. He was convicted of sexual misconduct and has been required to register as a sex offender, but he's litigating under his own name. Why should a medical student get a pass when Shane Kitterman does not? You're talking to someone who won the appeal in Doe v. MIT where this whole issue of pseudonyms... I don't care how many appeals you have argued or won. I want you to address the question in the terms in which I asked it. Okay, fine. In the Title IX area, pseudonym treatment is generally recognized as proper given the circumstances... Have we ever so held? I don't know if this court has, but in Doe v. Purdue, the district court level granted pseudonym treatment... Yes, and your client was permitted to proceed under a pseudonym by a magistrate judge. Yes. But I want you to address my question, which is why some people who have been found guilty, criminally guilty, of sexual misconduct have their names on the public record. But university students, presumably a higher class of person, are allowed to avoid it? We operate a system in which people charged with crime and presumed innocent have their names on the public record. Why are university students exempt from that? The reason why it has been generally ruled by the courts pseudonym treatment is appropriate is because of a variety of factors. One is you're basically preserving the status quo. In university disciplinary proceedings, there is confidentiality, and that is maintained during the litigation. It is recognized by courts... Yes, and I don't think you're addressing any of the Seventh Circuit jurisprudence about when confidentiality is permitted. But one of the holdings of the Seventh Circuit is the fact that the parties had agreed to confidentiality before litigation does not support confidentiality in litigation. Agreeing to confidentiality before litigation is, for example, an ordinary term of arbitration. It doesn't support confidentiality in litigation. I understand, but what the courts have said is we're preserving the status quo of anonymity so that during the litigation... Therefore, arbitration would proceed anonymously in federal court. No, that's precisely... We know it's no. Look, it is perfectly clear that you're not prepared to discuss this question. You're not acquainted with the Seventh Circuit authority on it. We will issue an order requiring the parties to file supplemental briefs on this issue. I appreciate that, rather than spending time in oral argument on this issue. I'd like my time back on that. I'd be more than glad because I've been briefing this issue of pseudonymity in a number of courts, and it's always been upheld, always. And I was referring to... You'll discuss it in... Yes, I know. Can I please go to my arguments? Please proceed. Okay, thank you. Three basic points. The rules of summary judgment were violated here by the district court given the massive omissions of fact and some misstatements of fact. You have de novo reviewed to take cognizance of that, and it is because of those omissions and misstatements that the district court ruled and the defendants argued against the Title IX and due process claims. The outcome matters as a result of what was not dealt with by the district court. I would like you to address two things. One, for the due process claim. Yes. And in particular, the due process claim as it relates to the expulsion. I'd like you to talk about the property or liberty interest that supports a constitutional claim. And the other thing I'd like you to talk about is, particularly given the standard of review, why it is when the plaintiff represents to the business school, the Kelly School of Business, that he's been reinstated to the medical school, quote, without limitation or restriction. I mean, I've looked at the letter from Dean Hess, and I'm trying to look at it open-mindedly, but it doesn't say that. It actually imposes an extra year of suspension and says, do this, do that. You've got to comply with all of the things. You've got to have counseling. You've got to have other things. So it's hard for me with that statement, never mind all the rest of it, but with that statement for them not to take the action they did. So two things. Okay. Let me deal with the second point, because there were allegedly two statements in a business school application that were, quote, not correct. Didn't say false. Didn't say anything else. It didn't say he's unfit. He said two not incorrect statements. One was, I grant your – the appeal was granted. He just says, I grant your appeal, period, and then he goes on to lay out the conditions under which Doe will be readmitted to the medical school, and there are a lot of them. It's not, I grant your appeal, you didn't do anything wrong. It reads quite differently. Well, wait a minute. I've read this. The fact is that he satisfied those conditions. The medical school sent an email to John Doe, 3718 in the record, saying you've satisfied the Title IX sanctions. There was no real dispute that he had satisfied what was laid out in the March 27, 2020 letter of Dean Hess. But he tells the Kelly School that he had been given reinstatement to IUSM, quote, without limitation or restriction. And I'm not saying it's the only way to read it, but they read it as a misrepresentation of what the terms of the readmission were. I don't know that he'd even been to this other dean. I can't remember the name of that person, but Allen maybe. He didn't use the word misrepresentation. He said not correct in his June 16th letter. What does that mean? Because the letter focuses on two statements, one that it allowed my admission without condition. Okay? What was true? Was that what was in the March 27, 2020 letter of conditions John Doe had satisfied? And what's more, Dean Hess had granted the appeal and set aside the Student Promotion Committee edict of dismissal. Right. He certainly set aside. And if that's all he had said, I was going to be dismissed, but then the dean gave me a second chance on certain conditions. That's 100% accurate there. Okay. But that's not what he said. Okay. So what you're focusing on is the statement that John Doe said that this allows my admission. Now, keep in mind that when he met with Dean Hess about this, Dean Hess said, I'm granting your appeal. I look forward to being on the stage in a couple of years. And in his March 27, 2020 letter, he says at the end, basically don't screw up, but, you know, I anticipate your, you know, return in May 2021. So there was an expectation of John Doe getting back into school. May I add one other thing? John Doe in April 9, April 23, two times asked Dean Allen, how shall I deal with this in my medical school, in my business school application? No response. It wasn't just one. No, you're absolutely right that, you know, on the other side of the equation, he seems to have disclosed everything to the Kelly School. Yes. And which makes it mysterious as to why he would have phrased the statement that he did the way he did. But he did give them the file. Yeah, he did. And that's the point. You're focusing on wording, which if he had been responded to, they may have said, well, word it this way. But he didn't get that advice. And so he did his best there. I might also add, we're talking about dismissal. There had not been the issue before Dean Hess had sent the letter. And one of the points of Seventh Circuit jurisprudence, the Pugel case, was that the more extreme the sanction, the more procedures are appropriate. And this cries out for due process rather than just a letter and you call it academic, because it wasn't. It was Dovey University of Utah, where there were some allegedly misleading statements. They called that a disciplinary dismissal. And that required due process. And that's my point here. Due process was appropriate to deal with what you're talking about. One sentence in a multi-page application where he discloses a lot, that is not the basis for suddenly saying, oh, you're not fit. Because that's not said. You can write that, but you explain it and you use the English language. This was just two not correct statements. And the first one, I can tell you, it is correct. Now, as to property and liberty, you had raised that. Have I answered as to the second one? Oh, we can go on. Okay. I want to satisfy you there. The property interest, by the way, in this report said, look, you know, he found property that Dean has had waived, hadn't argued it. What we do in our brief is to say, look, under the Rothcase Supreme Court, the Indiana state law of implied contract, and the Indiana University School of Medicine guidelines, he has a property interest. He has a property interest because the guidelines at 69.2 in the record, good standing means you automatically advance if you've got breaks. And it was established in the record that John had passing breaks. And secondly, also in 69. But what do we do about the good standing part? I mean, he had gone through the Title IX process and had been found to have committed a behavioral violation in that process. Does that mean he was still in good standing? Well, the guidelines here are referring to the process of promotion within the school. And at that point, he had passing breaks, and he was entitled to move forward. Also, the guidelines in the second aspect of the property claim is they require a hearing before the Student Promotion Committee for any student accused of violation of standards of ethics before dismissal. So those two points, you know, the automatic transfer and the SPC process gives you a property right under this court's precedence. This is not like in Doby-Perdue where we're basically reliant on Indiana state law of implied contract alone. This looks at the guidelines, although it notes the Supreme Court decision, Roth notes the implied contract of Indiana law. It also points to the guidelines that establishes the property right. Now, your opponents say guidelines are guidelines. They're not law. Guidelines are, within this realm of implied contract, the contract. And you can talk about, quote, guidelines, but in terms of viewing whether there's a property interest for the purpose of the 14th Amendment, that's enough. That's enough. Also, there's the liberty interest under Man v. Vogel because his reputation is harmed, and he had, you know, his legal status. So you have, with property liberty, which the district court didn't dispute, a basis for looking at, did John Doe get to prosperous in connection with this expulsion? The answer is absolutely not. He just got this letter. And you can say, well, this wasn't worded very well. Let's put aside the fact that I asked, so to speak, how I should read it and say, was that really something that was, quote, not correct? And the circumstances were he had complied with the requirements, and the school confirmed that. And he had done what he was supposed to do per Dean Hess's March 27, 2020 letter. So in his mind, he would be able to go back to school, and as Dean Hess said when he spoke with John Doe, that he would be up on the stage in a few years. And that as anticipated, he would be back in school in May of 2021. And that's why here, if you focus on how little is, you know, what little there is said here, this is being used by the school and says, oh, you're not fit. That was never said by Dean Hess. And if you're going to say that, you've got to say it in plain English, and you've got to explain why. And these two statements are not a basis for saying that, especially since you were asked to clarify, okay, what should I state here? It's totally unfair. And this is the kind of extreme sanction that this court's pubic case would say, call for additional procedures. And there was just no procedure here. Now, I think I've ran out of time. And I didn't get to talk about Title IX, which I think is very important, but I'm doing what I can do. Thank you, Mr. Blyler. Ms. Markle. May it please the court. The district court's entry of summary judgment on John Doe's due process and Title IX claims should be affirmed. To start with, Judge Wood, your question about liberty and property interest, John Doe has not established either. Under the liberty interest test, he would need to show stigma plus, which would require him to show that the university took some action against him, made some disclosure of this discipline. The university did not make a disclosure. John Doe made the disclosure to the Kelley School. And the university sharing information within itself does not satisfy a disclosure. There's also not a property interest. The claim of the property interest is that John Doe was entitled to appear before the SPC before being dismissed. Yet, that statement appears in something that is entitled guidelines. And those guidelines expressly say that the dean has discretion whether to bring a matter to the Student Promotions Committee. But here's the thing. I mean, it's ‑‑ I'll draw an analogy between employment at will and employment situation in which you can be dismissed only for cause. There's often a great deal of discretion in what constitutes cause. But we would typically say that you do have a protected interest. Let's suppose you're a state employee so that these things apply. You do have a protected interest if you can be discharged only for cause. And this looks like the same thing to me. You know, he's got this interest in his continued status as a student. And, yes, it can be taken away from him, but only for cause that the dean and the other responsible authorities find satisfactory. And there's some guidance about what would constitute that cause and some discretion, which is not unusual. Your Honor, this court's jurisprudence limits the student's interest in a liberty or property interest under these circumstances. But even if John Doe establishes a liberty or property interest, he certainly received the process he was due. I don't see how he did in the final letter from the dean where the dean just says, you know, you blew it and you're now going to be expelled. He's not told, you know, we'll meet next week in my office and you can explain this troublesome statement in the application to the Kelly School. He just says you're out. And so John Doe never has the opportunity to attempt at least to put this statement in context. And the thing that supports that to me is it's so weird that he would give the whole record to the Kelly School, disclosing everything about all of the events that led up to where he was, and then suddenly blow it all with this careless or maybe ill-chosen statement in the application, which the dean reads in the worst possible way. Your Honor, this dismissal was an academic dismissal. Well, see, I wonder about that, too. You can call anything an academic dismissal. If it's by an academy. Under this Court's authority of the Fenge case, this decision falls squarely within an academic dismissal because the hallmarks are a decision maker exercising his discretion and expertise and determined who— There's no discretion and expertise. What your basic argument is is that it's important to be honest if you're going to be a doctor. I would say it's important to be honest if you're going to be a school teacher. It's important to be honest if you're going to be a lawyer. And every disciplinary code, if you violate one of the provisions of that disciplinary code, you're displaying dishonesty. You're displaying a disregard for the law. It subsumes everything. And the Fenge case has far more process, actually, involved in it than this case does. But the Court determined—this Court determined that process was not necessary in Fenge for an academic dismissal, which is where the dean of the medical school has the discretion to determine who should be a doctor. And the Horowitz case describes— So you think unlimited discretion. I've decided that people with red hair shouldn't be doctors. No, Your Honor, because the case law requires a careful and deliberate decision and that John be notified of it. But that doesn't mean anything. Let me ask Judge Wood's question in a different way. The Supreme Court said in Goss v. Lopez that any student suspended or expelled is entitled to some kind of hearing. And Judge Wood is concerned that in the end there was no kind of hearing. Whether or not there's a distinction between academic and disciplinary in how elaborate the process is doesn't matter if there was no opportunity for a hearing. Maybe you answer Judge Wood by saying, well, it's academic. I would like you to focus on the question, did—was Doe offered any kind of hearing? That is, could he have written a letter to the dean? Could he have remonstrated with the dean? I mean, what was his way of making his position clear to the dean? Your Honor, if this termination dismissal is treated as a disciplinary dismissal, that process is due— Forget academic disciplinary. That's what I'm telling you. Forget it. I want you to tell me what the process was by which the student could have made—could have argued his position to the dean. Yes, Your Honor. And that process was satisfied two ways. First of all, through the Kelly School. No, no. After the letter. No. He's told you're out by the dean. And Judge Easterbrook is looking at that moment, not back with the Kelly School or the Title IX proceedings or any of the rest of it. When he's told the axe is going to fall, did he have—and because of these alleged misrepresentations in the Kelly School application, however it's phrased, I don't really care. It doesn't matter. What opportunity—the dean didn't say anything about a process after that. And so if there was some secret process that we don't know about, it would be nice to hear. There was—the process is that the authority requires an opportunity for the student to explain the student's position. John Doe had that opportunity when he presented to the Kelly School. The Kelly School said— No. No, he didn't. Tell us the opportunity he had to explain his position to the dean of the medical school. Your Honors, the record, his explanation was provided to the dean of the medical school, to Dean Hess. And the process is also— When? Where? After he was told that this was such a serious problem in the way he filled out the Kelly School application that it required banning him from the medical profession forever? The question, and what John Doe needed the opportunity to explain, was why did he misrepresent on the application to the Kelly School? When and how did he have that opportunity to explain that to the dean of the medical school? I can imagine your answer saying something like, well, the letter told him, if you disagree, tell me why. Or there may be some general university procedures about what happens if you get an unwelcome letter from the dean, what you're supposed to do. The letter didn't say the first thing. Are there some general university procedures that tell you what to do if the dean has taken adverse action? No, Your Honor, because the other way that due process is satisfied here from this decision is because it's a continuation of the Title IX process. The Title IX process resulted in a finding of violation of the Code of Conduct, which then triggered a medical school process. That medical school process was to determine if additional sanctions should be placed on John Doe. But the misconduct that is mentioned in the letter hadn't happened yet when all of this Title IX business is going on. And so what I'm trying to figure out, and I think maybe we all are, is the event that we're focused on, the thing that gets him kicked out, is not the Title IX process. The Title IX process leads to, you know, remedial actions and a suspension and some other things that he's going to be able to come back from. It's only this final thing where the dean looks at this statement that he made in the Kelly School application form, thinks that it's, you know, hoodwinking the Kelly School or something. He draws an adverse inference from it for sure. And there is no opportunity that I have found in this record for John Doe to at least attempt to assuage the dean's concerns. Maybe the dean would have bought it. Maybe he wouldn't have. That's, you know, outcomes of hearings are not what we're talking about. We're talking about the process. Your Honor, the reason that I refer to the Title IX process is because the ultimate conclusion of that was that and put the SPC's dismissal aside under certain conditions. So we are still in a continuation of this process. The conditions are that John Doe must not have any further problems. He must be an upstanding citizen and have no further problems. Dean Hess determined that the misrepresentations in the Kelly School violated that letter. I understand that perfectly. I'm just floored by your answer to my question, that there's nothing in the university statutes or regulations about what a student can do if the student doesn't like a dean's decision, right? Not even a statement, write a letter to the dean explaining where you've gone wrong. Deans make all sorts of decisions that adversely affect students. Students complain to deans all the time. But if I understand your answer correctly, at this school, the dean's decision is final and you can't even write a nasty letter in response. Your Honor, I'm sorry. To be clear, my answer is that there was no further process that was due. No process. There was no need that this decision went any further because the dean has had— But Doe clearly doesn't agree with that. He sees the dean as having understood in the full context of his application this to be a bad statement and he thinks in the full context of his application he wants the opportunity to contest the dean's negative inference. And that was, just as a reminder, your brief doesn't discuss Goss against Lopez. That is the thing the Supreme Court said is the irreducible minimum before somebody is suspended or expelled from school. That, in particular. Your Honor, it is an opportunity to address the conduct. Here, John Doe had the opportunity to address the conduct. It's an opportunity to address the decision-maker's reason. The decision-maker about the conduct. The fact that the discussion and addressing the conduct occurred with the Kelly School does not change that John and his lawyer had an opportunity to explain why there are misstatements in the application. When? And Dean has had that record. When? He didn't even know that this was going to be the—he thought he had disclosed everything. At least we have to accept this, taking the facts on this record. He thought he had disclosed warts and all, you know, everything that had happened at the medical school. And he gets this letter from the dean saying, well, I don't like the way you paraphrased it up in your application, and so I'm going to say that this is further student misconduct. I'm kicking you out pursuant to, you know, what I warned you way back when, when the Title VII thing came over. There's never an opportunity to contest that. And as Judge Easterbrook is pointing out, the Supreme Court has been down this path in Goss, and it seems very troubling that he wasn't given a chance to contest it. He was just out. This court's authority does not stand for the proposition that the explanation must be provided directly to the decision maker. It was provided to the Kelly School, and that explanation was provided to the decision maker.  But Dean Hess assessed that and determined that this was dishonest. And under FENGI, a decision that is dishonest can be grounds to say that a person should not be a physician. That is what Dean Hess did. He also determined that as a continuation of the entire process that John Doe had had over years, that the last chance that John had was to meet the conditions to avoid the dismissal that the SPC had already determined was appropriate. And Dean Hess determined that the dismissal then became appropriate when John misrepresented the facts of his opportunity to return to the medical school. And turning to the Title IX aspect of this case, there certainly is no inference or evidence that would suggest that there was any anti-male bias in the process that John Doe received. He had a full and fair hearing. He had a full and fair investigation. And there is no indication of any conduct that would suggest that this was improper in any way. The conclusion was reached based on the evidence in the record, and the evidence in the record established that on a preponderance of the information, that the hearing officers believed that this was intentional dating violence and reached that conclusion, and then provided the sanction to John Doe. Is there no further questions? Thank you, Your Honors. Thank you very much. Your time has expired, counsel. The court directs lawyers for both sides to file supplemental memoranda on the question whether anonymity is appropriate in this case. Those memoranda should address the Seventh Circuit's decisions on anonymous litigation. Doe v. Smith, 429 Fed 3rd 706, summarizes some of those principles and is a potential starting point. Counsel have 14 days to file those supplemental memos, and after they have been received, the case will be taken under advisement.